**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Tara Broadwater,

                     Plaintiff,

v.

State of Minnesota Department of Human Services,

                     Defendant.

Civ. No. 13-539 (RHK/FLN)

**MEMORANDUM OPINION AND ORDER**

Gregg M. Corwin, Jordan Stockberger, Gregg M. Corwin & Associate Law Office, St. Louis Park, Minnesota, for Plaintiff.

Kristyn M. Anderson, Alethea M. Huyser, Gary R. Cunningham, Minnesota Attorney General's Office, St. Paul, Minnesota, for Defendant.

**INTRODUCTION**

In this action, Plaintiff Tara Broadwater contends her former employer, Defendant State of Minnesota Department of Human Services ("DHS"), discriminated against her based on her disability by denying her request to transfer to another facility and terminating her employment. DHS now moves for summary judgment; for the reasons set forth below, its Motion will be granted.

**BACKGROUND**

The following facts, though largely undisputed, are recited in the light most favorable to Broadwater.

Broadwater is a board-certified psychiatrist. Beginning in 2007, she worked for DHS's State Operated Services Division, treating patients at the Minnesota Security

Hospital ("MSH") in St. Peter, Minnesota. From 2007 until 2011, Broadwater worked at MSH without incident and received generally positive performance reviews.

On August 8, 2011, she was the victim of a severe domestic assault, suffering a concussion, occipital neuralgia,[1] and post-concussion syndrome. Her resulting symptoms included: severe headaches, insomnia, diminished concentration, loss of appetite, and difficulty with executive functions such as multitasking. Broadwater returned to work soon after the injury and continued to work full-time until December 22, 2011. At that point, she requested a leave of absence under the Family and Medical Leave Act ("FMLA") to recover from her injury. Her request was granted and her leave began December 23.

On December 19, 2011, prior to her FMLA request, one of Broadwater's patients complained that he wanted to stop his medications but had not been able to see his doctor (Broadwater). He complained that he "felt neglected" by Broadwater, prompting DHS to review the patient's file. It discovered an absence of psychiatric progress notes in the file, despite Broadwater having treated the patient numerous times. In response to this discovery, it opened an internal investigation into her medical documentation for all of her assigned patients.

On January 6, 2012, Dr. Alan Radke, the State Medical Director, called Broadwater at home to ask if she could work part-time doing forensic evaluations for

---

[1] Occipital neuralgia is a neurological condition in which the occipital nerves, which run from the base of the neck up through the scalp, are injured or inflamed, causing chronic pain. http://www.webmd.com/migraines-headaches/occipital-neuralgia-symptoms-causes-treatments (last visited May 23, 2014).

MSH. She declined, telling him she was not a forensic psychiatrist. He asked her when she would be returning from FMLA leave and she responded that she did not yet know. Then, according to Broadwater, he referenced a disciplinary proceeding involving her and suggested she turn herself into the Minnesota Board of Medical Practice; she did not understand to what he was referring.

The preliminary audit of Broadwater's patients' records was completed on January 25, 2012, while she was on leave. It revealed that she had fallen far behind on her charting during 2011. MSH's policy required her to dictate progress notes within three days of seeing a patient, but she had neglected to dictate 105 progress notes between April and December 2011. (Ochsendorf Aff. Ex. A.) She tried to catch up in December, dictating all 105 notes over the course of eight days. But they remained temporary notes, as she never finalized them or placed them in patient files. (Id.) She offered to finalize them while on leave, but DHS did not allow her to do so. The audit also revealed that she had not completed the required quarterly progress notes for 17 of her 27 patients. The results of this audit were provided to DHS's Division of Licensing,[2] which determined that Broadwater had violated its Psychiatric Assessment policy and Minnesota Statutes § 245A.04, subd. 14 (relating to the licensing of DHS facilities) and issued MSH a citation. (See Broadwater Dep. Ex. 24.) The remainder of the investigation was stayed while Broadwater was on leave.

---

[2] The Division of Licensing is an independent division of DHS, separate from the State Operated Services Division for which Broadwater worked.

By July 2012, Broadwater's doctor cleared her to return to work part-time. She did not wish to return to her position at MSH and began looking for employment at other DHS-administered psychiatric facilities. Dr. Peter Miller, who knew of the ongoing disciplinary investigation, offered her a part-time position with the Community Behavioral Health Hospital ("CBHH"). Miller's understanding from Radke was that Broadwater would be allowed to return to work for DHS part-time under close supervision with just a letter of reprimand. Radke denies telling Miller this. According to Radke, he and Miller discussed a *range* of possible outcomes of Broadwater's investigation, which included her returning to work part-time with a letter of reprimand. Regardless, at some point—it is not clear from the parties' submissions when or how—Broadwater requested to transfer to CBHH. DHS denied her request, citing its policy against allowing transfers while an investigation is pending. So on October 2, 2012, she returned to her position at MSH to work part-time.

The following day, Karen Ochsendorf, who was in charge of the investigation, interviewed Broadwater. In the interview, Broadwater acknowledged that she was expected to dictate progress notes within three days of seeing a patient, admission notes within seven days, and discharge summaries within two weeks. She also acknowledged she was behind on her notes and had tried to catch up by dictating 105 notes in December. Broadwater described her injury and symptoms to Ochsendorf, ostensibly as part of her explanation for why she was behind on her notes in December. She told Ochsendorf she "never was the best at getting notes done in a timely manner" and that late notes were an "ongoing issue" for her, which at least three people had addressed with

her previously.  Broadwater stated she had been caught up on her charting in March 2011, but began to slide again.  She described the period between April and December 2011 as "the worst it slid."  Ochsendorf issued a completed investigation report to Radke, Pratt, and Karen Olson.  The report included Broadwater's statements to Ochsendorf regarding her charting and injury and noted that Broadwater was rated as "below expectations due to dictation timeliness" in her 2008 performance review.  Broadwater recalls explaining to Ochsendorf that she had lost some of her notes due to technical problems with the charting software, but this was not mentioned in the report.

After reviewing the report, Radke, Pratt, and Olson met to discuss the results of the investigation.  Each testified that they discussed several disciplinary options for Broadwater, ranging from a letter of reprimand to suspension or dismissal.  Ultimately, they recommended dismissal to Anne Barry, who was the final decision maker.  Barry sat down with the three of them to discuss the range of disciplinary options, and concluded dismissal was appropriate given the large volume of late notes and the duration of Broadwater's problems with charting. On October 12, 2012, Pratt called Broadwater into his office and informed her they were eliminating her position.  She later requested a reason for the elimination and was sent a letter citing her failure to timely complete her patient charting, explaining it had violated MSH policy and Minnesota law and caused MSH to receive a citation from the Licensing Division.

In 2013, Broadwater commenced the instant action against DHS, alleging it had discriminated against her on the basis of her disability by terminating her and not allowing her to transfer to the CBHH facility.  Broadwater asserted claims under the

Minnesota Human Rights Act, Minn. Stat. § 363A.01 et seq., which she has agreed to dismiss, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 et seq., which remains pending. DHS now moves for summary judgment on the ADA claim.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The ADA prohibits discrimination against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). Broadwater asserts DHS discriminated against her on the basis of her disability in two ways—by dismissing her because of her disability and by failing to accommodate her disability via transfer to CBHH.

**I.     Wrongful Termination**

In the absence of direct evidence of discrimination, which she has not alleged, Broadwater's wrongful-termination claim under the ADA is analyzed using the familiar McDonnell Douglas burden-shifting framework.  E.g., Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 913 (8th Cir. 2013); Brown v. City of Jacksonville, 711 F.3d 883, 888–89 (8th Cir. 2013).  Broadwater must first establish a prima facie case of discrimination, which requires her to show:  (1) she is a qualified individual with a disability; (2) she suffered an adverse employment action; and (3) the adverse action was based on her disability.  Brown, 711 F.3d at 888.  DHS does not dispute that Broadwater was a qualified individual and suffered an adverse employment action.  But it contends she was not disabled within the meaning of the ADA and any alleged disability was not the cause of her termination.

**A.  Broadwater's Disability**

As relevant to Broadwater's claim, a disability under the ADA is defined as "a physical or mental impairment" that "substantially limits the ability of the individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2.  "Major life activities" include "sleeping, . . . concentrating, thinking, . . . and working," 42 U.S.C. § 12102(2), all of which Broadwater contends were substantially limited by her post-concussion syndrome.

Broadwater's strongest evidence of disability relates to her impaired ability to work.  When she returned from FMLA leave, her doctors had only cleared her to work up

to twenty hours per week.  DHS dismisses this restriction as insubstantial, citing cases that require a plaintiff to be "unable to work in a broad class of jobs" before qualifying as disabled.  St. Martin v. City of St. Paul, 680 F.3d 1027, 1032 (8th Cir. 2012) (internal quotation omitted); see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999); Knutson v. Ag Processing, Inc., 394 F.3d 1047, 1051 (8th Cir. 2005).[3]  But these cases apply an outdated version of the ADA.  When Congress amended the ADA in 2008, it overturned then-existing precedent and instructed courts to construe the definition of disability "in favor of *broad* coverage of individuals."  42 U.S.C. § 12102(4)(A) (emphasis added); see also Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010) (The 2008 amendments "broadened the definition of what constitutes a disability.");  29 C.F.R. 1630.2(j)(1) (An individual's impairment need *not* "prevent" or "significantly or severely restrict" a major life activity to qualify as a disability.).

      Under the current, more liberal definition, the Court concludes that being unable to work more than twenty hours a week could qualify as a "substantial" limitation.  The standard American workweek is forty hours.  Thus, her ability to work is *half* that of most people in the general population.  Moreover, Broadwater suffers from insomnia and diminished executive functioning and concentration.  Although the record of these limitations (insofar as it has been submitted to the Court) is thin, the evidence of her impairments overall is sufficient to create a question of material fact regarding her

---

[3] See also Ifill v. United Parcel Serv., No. 04 Civ. 5963, 2008 WL 2796599, at *9 (S.D.N.Y. July 17, 2008); Kelly v. Retirement Pension Plan, 209 F. Supp. 2d 462, 475 (E.D. Pa. 2002); Shaw v. Greenwich Anesthesiology Assocs., P.C., 137 F. Supp. 2d 48, 55 (D. Conn. 2001); Newton v. Signature Grp., No. 99 CV 4772, 2000 WL 1016945, at *9 (N.D. Ill. July 20, 2000).

alleged disability. E.g., Fenney v. Dakota, Minn. & E. R. Co., 327 F.3d 707, 716 (8th Cir. 2003) (reversing summary judgment, in part, because plaintiff proffered sufficient evidence of disability to create "a reasonable inference from which an issue of material fact can be drawn").

### B. Causation

Broadwater advances two arguments regarding why her termination was based on her disability. First, she argues that the timing of the investigation and her termination were "highly suspicious." To the contrary, DHS commenced its investigation just *days* after a patient complained about neglect. This was *months* after her allegedly disabling injury and *before* she requested FMLA leave. True, her termination came within two weeks of her returning from FMLA leave and after Pratt, Radke, and Olson read the investigation report mentioning her injury. But that report also detailed the extent and duration of her dilatory charting, which is why DHS says it terminated her. So the timing of her termination also supports DHS's proffered reason. The Eighth Circuit was presented with similar facts in Hill v. Walker, 737 F.3d 1209, 1219 (8th Cir. 2013). There, the employer terminated the plaintiff eleven days after she engaged in a protected activity and ten days after she engaged in misconduct. Id. The Court stated, "where the employer's proffered reason for action is virtually contemporaneous with the protected activity, we are disinclined to declare a genuine issue of fact for trial based on temporal proximity alone." Id. Similarly, this Court concludes that timing alone is insufficient evidence of causation where the decision makers discovered information about both her disability and misconduct simultaneously.

Second, Broadwater contends her problems with charting were caused by her disability and thus even DHS's proffered reason for terminating her was "based on" her disability. Putting the legal merit of this argument aside, the evidence clearly shows she consistently failed to record her patients' notes in a timely manner *before* she became disabled. Her performance reviews dating back to 2007 and 2008 mention this issue, and Broadwater herself acknowledged it was an "ongoing" problem. In addition, the 105 progress notes she dictated in December dated back to April 2011—four months before her disabling injury in August.

In the absence of evidence showing DHS terminated Broadwater "on the basis of disability," her claim for wrongful termination fails.

### C. Pretext

Even if Broadwater had established a prima facie case of discrimination, she has not presented sufficient evidence to demonstrate DHS's proffered reason for her termination (her belated charting) was pretext for discrimination. Brown, 711 F.3d at 888–89 (once plaintiff establishes prima facie case, the burden shifts to employer to proffer legitimate, non-discriminatory reason for termination, at which point the burden shifts back to plaintiff to demonstrate proffered reason is mere pretext).

A plaintiff may demonstrate pretext by showing the employer's proffered reason for terminating her has no basis in fact or is otherwise unworthy of belief. Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005). According to Broadwater, she was "caught up" on her notes. She asserts she was caught up because she had dictated the 105 late notes before the investigation began. But this argument misses the

mark.  She was not, in fact, current on her notes because she never finalized them.  And more importantly, regardless of whether she eventually "caught up," she acknowledges she violated DHS policy by dictating them months after her patient visits.  The Court fails to understand the logic behind Broadwater's argument that her "catching up" in December somehow nullified DHS's authority to discipline her for eight months' worth of policy violations.  There is no genuine dispute that she was behind on her charting and in violation of DHS policy.

Broadwater also asserts she was not as far behind on her notes as DHS alleges.  She claims some of her notes were lost due to computer difficulties; thus her late notes "had more to do with the inherent problems with the hospital's dictations system, and less to do with [her] deficiencies." (Pl.'s Mem. at 14.)  But "[t]he critical inquiry in discrimination cases like this one is not whether the employee *actually* engaged in the conduct for which he [or she] was terminated, but whether the employer in good faith *believed* that the employee was guilty of the conduct justifying discharge." McCollough v. Univ. of Ark. for Med. Sci., 559 F.3d 855, 861–62 (8th Cir. 2009) (emphases added).  Broadwater acknowledges that the investigation report did not mention her technical difficulties and she has presented no evidence calling into question the decision maker's good-faith belief that her missing and late notes were due to her own "deficiencies."

A plaintiff may also prove pretext by "showing that the employer varied from its normal policy or practice to address the employee's situation." Hite v. Vermeer Mfg. Co., 446 F.3d 858, 867 (8th Cir. 2006) (citing Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001).  "For example, the employee could show that the employer

routinely treated similarly situated employees who were not in the protected class more leniently." Id. (citing Smith v. Allen Health Sys., Inc., 302 F.3d 827, 835 (8th Cir. 2002)).

Broadwater alleges that other, non-disabled employees who were behind on their charting were not terminated or even disciplined. But in support, she offers only vague hearsay testimony—for example, that there were "rumors" other doctors were behind or other doctors told her they were behind. But she has offered no admissible evidence to confirm this allegation or any further details, such as whether they were days behind or months behind, whether patients had complained about them (prompting an investigation), or whether their supervisors knew they were behind. In fact, the most specific comparator she offers is an unnamed DHS physician who, according to the local newspaper, was fired for late charting in 2005, rehired in 2009, and then fired for the same reason again in 2013. In the Court's view, this article (issues of its admissibility aside) *undermines* Broadwater's allegation, as it shows DHS *has* fired a (presumably) non-disabled employee for the same infraction as Broadwater—twice.

Finally, she argues DHS's disciplinary policy on charting is inconsistent because first Radke was going to reprimand her, but then she was terminated. Even assuming an employer changing its adverse employment decision could be evidence of pretext, Broadwater has not shown that such a change occurred here. In support of this argument, she cites a September email from Miller in which he states that Radke told him she would receive a reprimand. But Radke did not make the ultimate decision, Barry did, and the emails among Radke, Pratt, Olson, and Barry prove she did not reach a decision

regarding Broadwater until October 11, 2012. Up until that date, their emails demonstrate they were actively considering *several* possible courses of action. Thus, while Miller's email may reveal a change in Radke's opinion or expectation as to Broadwater's discipline, it does not support an inference that DHS decided to reprimand her and later changed its decision after she returned from leave.

In sum, Broadwater has failed to present sufficient evidence that her termination was based on her alleged disability, and she has further failed to demonstrate that DHS's proffered reason for terminating her employment was pretextual. As a result, her wrongful-termination claim fails.

## II.     Failure to Accommodate

Broadwater also alleges that DHS discriminated against her by failing to transfer her to CBHH. "An employer commits unlawful discrimination . . . if the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)).

As an initial matter, the Court notes that DHS made at least one reasonable accommodation to Broadwater's disability—it allowed her to return to work part-time. But Broadwater asserts it should have transferred her to CBHH and allowed her to work part-time there instead of at MSH. This claim fails for the same reason as her termination claim. As already discussed, DHS was not required to *employ* her in light of her

delinquent charting, let alone transfer her to CBHH. And although DHS denied her transfer before reaching the decision to terminate her, its denial was in accordance with its policy prohibiting transfer of employees who are subject to ongoing investigations. Employers are not "required to reassign a disabled employee to a position when such transfer would violate a legitimate, non-discriminatory policy . . . and for good reason. The contrary rule would convert a nondiscrimination statute into a mandatory preference statute." Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 679 (7th Cir. 1998) (cited favorably by the Eighth Circuit in Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1020 (8th Cir. 2000)). So DHS was permitted to deny Broadwater's transfer according to this policy, regardless of her disability.

Additionally, her claim fails because she has not adduced sufficient evidence that she requested the transfer as an accommodation for her disability—an essential element of the claim. E.g., Ballard v. Rubin, 284 F.3d 957, 960–61 (8th Cir. 2002). In her deposition, she was asked, "Did you ever request an accommodation for your disability?" and Broadwater responded that she "simply talked to [her] supervisors so they understood exactly what was going on with [her] on a regular basis." (Broadwater Dep. at 53.) But she could not recall any instance in which she communicated to DHS that she was requesting a transfer *because of her disability*. Rather, she argues that her supervisors' knowledge of her disability (which they deny) "should have prompted [them] to make appropriate inquiries about a possible need for an accommodation." (Pl.'s Mem. at 20.) But the burden was not on DHS to inquire whether she needed accommodation. The ADA places the initial burden on the employee to request accommodation. Ballard, 284

F.3d at 960–61. Only then must the employer engage in the interactive process to attempt to find a reasonable accommodation. Id. A request for accommodation need not be in writing or use "the magic words 'reasonable accommodation,'" but it "must make clear that the employee wants assistance *for his or her disability*." Id. at 962 (emphasis added). Broadwater has not met this burden. There is no dispute she requested a transfer, but she has not demonstrated that she "made clear" to DHS that she was requesting the transfer because of her disability. This stands in contrast to her request to work part-time, which was clearly sought as an accommodation to her disability, and which DHS granted.

DHS was entitled to dismiss Broadwater for violating its policy instead of transferring her to another facility—this alone defeats her failure-to-accommodate claim. In addition, she has not shown she requested accommodation from DHS—an essential element of the claim.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that DHS's Motion for Summary Judgment (Doc. No. 30) is **GRANTED** and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 23, 2014

                                              s/Richard H. Kyle
                                              RICHARD H. KYLE
                                              United States District Judge